**STATE of Missouri, Plaintiff–Respondent,**

v.

**Randy L. WARRINGTON, Defendant–Appellant.**

**No. 18674.**

Missouri Court of Appeals, Southern District, Division One.

Sept. 29, 1994.

712

Matthew J. O'Connor, Office of the State Public Defender, Columbia, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SHRUM, Chief Judge.

Randy L. Warrington (Defendant) was convicted by a jury of possession of more than 35 grams of marijuana, a class C felony, § 195.202, RSMo Supp.1990. Finding him to be a prior and persistent offender, the trial court sentenced Defendant to seven years' imprisonment.

On appeal Defendant complains the trial court erred in admitting into evidence marijuana seized from the vehicle in which he was a passenger, in refusing to instruct the jury on a lesser included offense, and in failing to declare a mistrial following certain closing argument remarks by the prosecutor. We affirm.

## FACTS

In May of 1990, Luther Thomason (Luther) was working in undercover drug operations for the Barton County Sheriff's Department. Luther described himself as a full-time employee who was paid an hourly wage.

During the evening of May 3, while Luther was drinking beer in a Golden City bar, Defendant approached him and asked if he wanted to buy some "smoke," a slang term for marijuana. Luther testified he had not said anything to the bartender or anyone else about desiring to purchase drugs and that he never had seen Defendant before this encounter.

Luther told Defendant he would buy marijuana but he had no money and to get some he would have to go to the town of Jasper where he lived. At trial, Luther explained that his true intention was to meet the sheriff and "get wired" but, because he was unable to "shake" Defendant, he and Defendant departed for Jasper together in Luther's car. Luther identified his vehicle as a primer gray

1970 Chevrolet Nova, an "ugly car" with a bench-type front seat.

Before leaving Golden City, Defendant retrieved from another car a blue jeans jacket and a brown paper grocery sack. Defendant placed the sack and jacket between himself and Luther on the front seat of Luther's car. Defendant pulled a "cellophane bag" from the grocery sack, showed it to Luther, told Luther it was marijuana, and said that he had more.

As Luther drove toward Jasper, located in adjacent Jasper County, he decided he would try to contact Jasper County Deputy Sheriff Bill Fast who lived three blocks from Luther's residence. Upon reaching Jasper, Luther stopped at the apartment of his brother, Darrell Thomason. Luther told Defendant he wanted to see if "this one guy ... was interested in buying any smoke." While Defendant remained in Luther's car, Luther awakened Darrell and told him, "I have a guy out in the car that has a large sum of marijuana and I can't get rid of him. Get a hold of Bill Fast and have him pick us up because he was acting real nervous." Luther then returned to his car and he and Defendant drove around Jasper.

After Luther left his apartment, Darrell called deputy Fast at his home as Luther had asked. Darrell said he told Fast, "[M]y brother Luther had an individual in a car that had some drugs with him and that my brother wanted him to stop him."

Fast testified that he was off duty when Darrell called him around 10:15 p.m. Fast said Darrell, whom he knew, did not mention drugs in the phone call, but he did say that Luther "had a subject in the vehicle and would like for me to make a check of the subject." Because Fast knew that Luther was working for Barton County authorities as an undercover drug agent, he "anticipated to find some type of drugs in the vehicle."

Fast was familiar with Luther's car, which he described as an "early seventies" Chevrolet Nova, which was "faded green," a color he acknowledged could have been "primer." Fast soon saw Luther's Nova on Main Street in Jasper. He followed it for about two blocks, during which time he noticed the tail lights were faulty, blinking on and off. Fast activated his emergency lights, and the Nova "proceeded out of town." Fast eventually stopped Luther's vehicle on Highway 71 south of Jasper. From Luther's testimony we learn that when Fast activated his emergency lights, Defendant took the brown sack from the seat and put it "behind his legs right there in front of the seat."

After stopping Luther's car, Fast approached the driver's side. When Luther opened the window, Fast "could smell a strong odor of green marijuana." Fast obtained identification from Luther and Defendant and checked with the dispatcher for outstanding warrants. When he returned to Luther's car, Fast saw what he described as "a sandwich bag" on the front seat between Luther and Defendant. The bag was partially concealed by a blue denim jacket. Fast described the contents of the plastic bag as "a green substance like grass" that, based on his experience as a law enforcement officer, he believed to be marijuana. Fast ordered Luther and Defendant out of the car and obtained Luther's verbal and written permission to search the car.

When he searched the car, Fast found a brown paper sack containing fourteen plastic bags of marijuana "jammed in under the passenger seat," beneath where Defendant had been sitting. Fast seized the paper sack along with the plastic bag of marijuana that was on the front seat.

Upon analysis, the material in the bags was identified as marijuana, 115.25 grams total, with less than 10% of it being stems or immature seeds. Each bag was weighed separately. None contained as much as 35 grams.

At a November 1992 hearing on Defendant's motion to suppress the marijuana, Fast conceded the "real reason" he stopped Luther's car was Darrell's telephone call. Following the hearing, the trial court concluded the stop did not violate Defendant's constitutional rights and, therefore, the court overruled Defendant's motion to suppress.

At the December 1992 trial, Fast insisted that, had he been on patrol and seen a vehicle with taillights malfunctioning as were

those on Luther's car, he would have stopped it. The court admitted the marijuana into evidence over Defendant's objection. Defendant's request for instructions on the lesser included misdemeanor offense of possession of less than 35 grams of marijuana was rejected by the trial court. We will recite additional facts where relevant to Defendant's points on appeal.

## DISCUSSION AND DECISION

### Admissibility of Evidence

■ In his first point, Defendant argues that the trial court erred in admitting into evidence the marijuana. He contends the evidence was the fruit of a stop of Luther's car that was unconstitutional because it was "pretextual and not justified by a reasonable suspicion that criminal activity was afoot." Defendant relies on a line of United States Supreme Court and Missouri appellate court opinions, emanating from *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that deal with "investigative stops." [1]

The Missouri Supreme Court states the investigative stop rule regarding motor vehicles as follows:

"[T]he Fourth Amendment [is not] offended when a law enforcement officer briefly stops a moving automobile to investigate, founded upon a reasonable suspicion that the occupants are involved in criminal activity, if the suspicion is supported by specific and articulable facts."

*State v. Franklin,* 841 S.W.2d 639, 641[3] (Mo. banc 1992) (citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975)).

In *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Supreme Court discusses the *Terry* requirement that an officer have "a reasonable suspicion that criminal activity was afoot."

"The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause.... In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.' As we said in Cortez:

'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same— and so are law enforcement officers.' "

490 U.S. at 7–8, 109 S.Ct. at 1585–86[1,3], 104 L.Ed.2d at 10 (citations omitted).

■ Our review is limited to a determination of sufficiency of the evidence to sustain the trial court's conclusion about whether the stop violated Defendant's rights. We defer to the trial court's vantage point for assessing the credibility of the witnesses and weighing the evidence. *State v. Villa–Perez,*

---

1.  Before the United States Supreme Court first confronted the investigative stop issue, state and local law enforcement officers frequently used a "stop and frisk" technique during which suspicious persons, without probable cause for their arrest, were stopped on the street for questioning and occasionally searched for dangerous weapons. John F. Wagner, Jr., Annotation, *Law Enforcement Officer's Authority, Under Federal Constitution's Fourth Amendment, To Stop And Briefly Detain, And To Conduct Limited Protective Search Of Or "Frisk," For Investigative Purposes, Person Suspected Of Criminal Activity—Supreme Court Cases,* 104 L.Ed.2d 1046, 1049 (1991) (footnote omitted).

In *Terry,* the Supreme Court, for the first time, held that "(1) such investigative stops constituted 'seizures' within the purview of the Fourth Amendment, and (2) such limited protective searches for weapons constituted Fourth Amendment 'searches'." Annot., 104 L.Ed.2d at 1049. After *Terry* was decided, the constitutionality of particular investigative stops—sometimes called "*Terry* stops"—has turned on the reasonableness of the investigating officers' conduct. *Id.* An officer who initiates a stop, but lacks probable cause to arrest the person stopped, must have an articulable and reasonable suspicion of the person's involvement in criminal activity. *Id.* at 1049–50.

**716**

835 S.W.2d 897, 902[9] (Mo. banc 1992). We are free to disregard evidence and inferences contrary to the trial court's ruling. *Franklin*, 841 S.W.2d at 641[1]. To determine whether the evidence should have been excluded, we review the record of the pre-trial hearing on the motion to suppress as well as the record at trial prior to introduction of the evidence. *State v. Hoopingarner*, 845 S.W.2d 89, 92[2] (Mo.App.1993).

With our standard of review in mind, we examine the record to determine if it shows, in the words of the *Franklin* court, "specific and articulable facts" that support a conclusion by the trial court that deputy Fast had "a reasonable suspicion" that Defendant, an occupant of Luther's car, was "involved in criminal activity." We hold that the record supports such a conclusion.

Summarized, Defendant's argument is that Fast conceded the "real reason" he stopped Luther's car was the telephone call from Darrell; that Darrell simply told Fast to stop the car, not that there were drugs in it; that Fast not only did not know there were drugs in the car, his stop was "not even based on a hunch or gut feeling that illegal activity was afoot."

■ The record shows Fast had more than an "inchoate and unparticularized suspicion or hunch" that Defendant, an occupant of Luther's car, was involved in criminal activity. (For purposes of discussion, we accept Defendant's assertion that Fast's sole basis for stopping the car was Darrell's telephone call, and we consider only Fast's testimony of what Darrell told him.) There is evidence to support the following. Neither Luther nor Darrell was a stranger to Fast. Luther testified that he had known Fast "for quite a

while," that they had worked together in the Boy Scouts, and that Fast helped him "get into undercover work." Luther and Fast lived in a small town within three blocks of one another, and Fast knew Luther's automobile by sight. Fast knew Luther was working at the time as an undercover drug agent for the sheriff's department in adjoining Barton County. Fast testified he also knew Darrell. Thus, when Darrell told him Luther wanted his car stopped because Luther had a "subject in the vehicle and would like [Fast] to make a check of the subject," Fast put "two and two together" and "anticipated to find some kind of drugs in the vehicle."

Considering the "totality of the circumstances," we conclude Fast had at least a "minimal level of objective justification" for the stop. *See Sokolow*, 490 U.S. at 7–8, 109 S.Ct. at 1585[1,3], 104 L.Ed.2d at 10. Fast had more than an "inchoate and unparticularized suspicion or hunch" that criminal activity was afoot. *Id.* at 7, 109 S.Ct. at 1585[1], 104 L.Ed.2d at 10. The evidence supports a conclusion that Fast's stop of Luther's car was based on a reasonable suspicion that Defendant, an occupant in the vehicle, was involved in criminal activity. Thus the evidence was admissible and the trial court did not err. Point I is denied.

*Failure to Instruct on Lesser Included Offense*

In his second point, Defendant claims the evidence supported a verdict that he possessed less than 35 grams of marijuana, § 195.202.3, RSMo Supp.1990,[2] and, therefore, an instruction for that lesser and included offense should have been given. *See* § 556.046.2, RSMo 1986.[3] Defendant says

2. In material part, § 195.202 reads:
"1. Except as authorized by sections 195.005 to 195.425, it is unlawful for any person to possess or have under his control a controlled substance.
....
3. Any person who violates this section with respect to not more than thirty-five grams of marijuana is guilty of a class A misdemeanor."

3. § 556.046 reads:
"1. A defendant may be convicted of an offense included in an offense charged in the ... information. An offense is so included when

(1) It is established by proof of the same or less than all the facts required to established commission of the offense charged; or
(2) It is specifically denominated by statute as a lesser degree of the offense charged; or
(3) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein.
2. The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."

that because the marijuana was in two different locations in the vehicle (one bag containing less than 35 grams of marijuana being in the front seat of the vehicle beneath Defendant's jacket while the grocery sack, containing fourteen bags of marijuana, was on the right front floor board jammed under the seat), there is a basis for the jury to have believed Defendant possessed only the 35 grams in the bag found under his jacket.

■ Ordinarily, a decision on whether a particular offense must be instructed upon as lesser included offenses must be made on a case by case basis. *State v. Booker*, 631 S.W.2d 854, 857 (Mo.App.1982). "Error occurs only upon failing to instruct on lesser included offenses that are supported by the evidence." *Id.* As construed by Missouri appellate courts, § 556.046.2 limits the requirement of a lesser included offense instruction to those cases where there is some affirmative evidence that could form the basis of an acquittal of the greater offense and a conviction of the lesser included offense. *State v. Olson*, 636 S.W.2d 318, 322 (Mo.banc 1982); *State v. Pruett*, 805 S.W.2d 724, 725–26 (Mo.App.1991). Moreover, it is fundamental that the affirmative evidence relied upon must have probative value. *State v. Arbuckle*, 816 S.W.2d 932, 935 (Mo.App. 1991). However, a trial court should resolve all doubts upon the evidence in favor of instructing on the lower degree of the crime, leaving it to the jury to decide which of two or more grades of a crime, if any, a defendant is guilty. *State v. Ellis*, 639 S.W.2d 420, 422–23[4] (Mo.App.1982).

Defendant relies heavily upon *State v. Beck*, 849 S.W.2d 668 (Mo.App.1993), to support his second point. In *Beck* the state's evidence was that the police found marijuana in three separate places: a box on Beck's person (2.36 grams), bags on the floor of the car Beck was driving (10.87 grams), and a briefcase in the back of Beck's car (108.64 grams). *Id.* at 670. However, a passenger in Beck's automobile testified there was no briefcase and no marijuana in Beck's car on the day of his arrest, and a witness who saw the arrest from a convenience store testified she saw a police officer take the briefcase from a police car to Beck's car and then

return with it to the police car. *Id.* The *Beck* court concluded that the testimony of the passenger and the convenience store witness left open the possibility that Beck possessed less than 35 grams of marijuana and that Beck was prejudiced when the jury was not afforded the opportunity of making that finding through a lesser included offense instruction. *Id.*

■ Affirmative evidence like that from the *Beck* passenger and convenience store witness is not in this case; therefore, *Beck* does not support Defendant's point. Here, *all* evidence presented tended to show that *all* of the marijuana belonged to and was possessed by Defendant. Luther testified that the marijuana seized by Fast was not his, that Defendant brought all of the marijuana to Luther's vehicle, that Luther had no marijuana on his person or in his vehicle before Defendant got into Luther's car, and that no one else had access to his car after he and Defendant left Golden City. Unlike the situation in *Beck*, in this case there was no affirmative probative evidence from which the jury reasonably could have inferred that Defendant owned or possessed only the marijuana under his jacket on the front seat and not that in the grocery sack under the front passenger seat. Defendant was not entitled to a lesser included offense instruction merely because the jury might disbelieve some of the state's evidence or decline to draw some or all of the permissible inferences. *See Arbuckle*, 816 S.W.2d at 935; *Pruett*, 805 S.W.2d at 725–26. Evidence that the marijuana was in two locations in the vehicle, standing alone, is not the affirmative evidence called for in *Olson*. Point denied.

*Closing Argument*

For his third and final point, Defendant complains that the trial court should have granted his request for a mistrial when, in closing argument, the prosecutor referred to Defendant as a "brazen drug dealer" and a "drug pusher." Defendant argues that the use of such terms was not only an inflammatory appeal to him but also an improper reference to prior bad acts.

The comments about which Defendant complains came in the following portion of the prosecutor's argument:

"[Y]ou could believe that our officer and Luther Thomason and somebody else got together and cooked up this scheme to get this guy who none of them had ever seen before.... I don't think that's reasonable. Reasonable under the circumstances are, we have [a] brazen drug dealer here. I have never seen you before; I want to sell you some dope. I will get all you want because I'm so confident of myself, I'm not worried about who you are. I have been around long enough, I'm not going to let you get to the phone or anything because I know that's what undercover narcotics cops do and informants. I'm going to stay with you. That way you are not going to be able to tell anybody else and set me up. That's what you have got right here. Randy Warrington is a drug pusher. And he knew exactly what he was doing."

At this point defense counsel objected "to the prosecutor calling my client a drug pusher" and moved for a mistrial. The trial court sustained the objection, overruled the mistrial request, and instructed the jury to disregard the prosecutor's "drug pusher" comment.

Initially, we observe that Defendant lodged no objection to the prosecutor's "brazen drug dealer" comment and thus waived his claim of error regarding that matter. *State v. Jordan,* 834 S.W.2d 900, 901[1] (Mo.App.1992); *State v. Jackson,* 768 S.W.2d 614, 617[7] (Mo.App.1989). We decline to exercise our discretion to review under the plain error standard of Rule 30.20. *Jordan,* 834 S.W.2d at 901.

As to the "drug pusher" comment, we note that a prosecutor has the right to argue evidence and reasonable inferences from the evidence. *State v. Ward,* 745 S.W.2d 666, 672[13] (Mo. banc 1988); *State v. Pate,* 859 S.W.2d 867, 871[5] (Mo.App.1993). A prosecutor may state a conclusion if that conclusion is fairly drawn from the evidence. *Clemmons v. State,* 785 S.W.2d 524, 530[17] (Mo. banc 1990). A trial court's ruling in allowing argument of counsel is reversible

only for an abuse of discretion where the argument is plainly unwarranted. *State v. McDonald,* 661 S.W.2d 497, 506[14] (Mo. banc 1983); *Pate,* 859 S.W.2d at 871[6]. Thus, while epithets about a defendant made during closing argument are unnecessary and can rise to prejudicial error if they are sufficient to inflame the jury, when the characterization of a defendant is based upon evidence received at trial, such prejudice does not result. *State v. Grissom,* 804 S.W.2d 777, 780[6] (Mo.App.1990) (No prejudice in prosecutor's argument that Grissom, charged with possession of marijuana, was "a dealer" because there was evidence in record that Grissom had sold marijuana in the past, albeit not for a profit.)

In *State v. Pena,* 784 S.W.2d 883 (Mo.App. 1990), a defendant was charged with cocaine possession. In closing argument, the prosecutor told the jury it should send a message to "drug couriers" by convicting the defendant. On appeal, Pena charged the trial court erred in overruling his motion for a mistrial based on the prosecutor's characterization of him as a "drug courier" and "drug dealer." The court of appeals reviewed the evidence, noting that Pena "was in control of 137.23 grams of cocaine, contained in five separate packages with a street value of $150 per gram, or $20,584.50 total value. He left Dodge City, Kansas on March 1, arrived in Chicago, Illinois on March 2, and was arrested on March 3 on his way back to Kansas." Because of "the large amount of cocaine, its packaging, and the short duration of the trip" the court concluded it was reasonable for the prosecutor to argue to the jury that Pena was a dealer or courier. *Id.* at 887[9]. *See also State v. Bailey,* 839 S.W.2d 657, 661 (Mo.App.1992) (Based on the evidence, the prosecutor reasonably could argue to the jury that person charged with possession of cocaine and marijuana was a drug dealer).

Here, the prosecutor's argument that Defendant was a drug pusher was not plainly unwarranted. The jury heard evidence that, when he was arrested, Defendant had with him move than 114 grams of marijuana packaged for sale in fifteen plastic bags. Additionally, there was evidence that he offered to sell marijuana to Luther Tho-

mason (a stranger) and, after Luther showed an interest in buying, Defendant took his marijuana with him as Luther pretended to help Defendant look for other buyers.

Defendant's argument that the prosecutor's characterization of him as a drug pusher was an improper reference to his prior bad acts or prior convictions has no support in the record. The prosecutor called Defendant a drug pusher as he recapped Defendant's actions on the night of his arrest; his characterization was not based on Defendant's criminal history or earlier uncharged activities.

Considering the evidence here, we conclude that *Bailey, Grissom,* and *Pena* control. The prosecutor's statement that Defendant was a drug pusher was reasonable. Point denied.

Judgment affirmed.

FLANIGAN and MONTGOMERY, JJ., concur.